Thank you, Your Honor. I'll introduce my colleagues in the course of my first minute or two as we establish the number of cases that we have and the arguments, so I'll be introducing each of them. We really have three separate cases here today which have some significantly different facts, but we believe that the overarching legal issues that occur in these cases permit us to argue coherently as a group. So, my name is Stephen Ryan. I represent the Nevada Power Companies. I'm with the Manat Law Firm. Accompanying me is Mr. Berliner. I will be addressing in the first instance the issue of just and reasonable rates and why the FERC was wrong in denying an analysis of our complaint under that standard. My colleague, Randy Elliott, from the Southern California Water Company, will address the court second and will address the issues specifically about the contracts at issue for the Nevada Company and for Southern California, particularly FERC's erroneous ruling with regard to the contract claims in that case and why our clients did not give up their fundamental statutory rights. Third, Mr. Christensen with the Sonoma County group will be discussing for all of us why the application of an inappropriately crabbed and narrow mobile Sierra test did not make sense here. For any one of those three arguments, if you agree with us, whether the arguments that each of us are going to present that cover all of the three cases, in essence, you would have to reverse and remand this case. Let me begin by saying that there are essentially, oh, I apologize, let me also introduce, and not arguing with me, is the representative of the Nevada Attorney General Bureau of Consumer Protection, Mr. John McCafferty. They are also a petitioner in this case, but for the coherence of our argument, he's agreed not to present his position orally today, but he is here if the court has any questions about that position. Let me take just a couple of minutes to set the context of these cases. The record in this case is very, very large, but actually, I'm going to read to the court, I'm not going to make my argument by reading, but I'm going to read a couple of paragraphs of facts that I believe are absolutely the critical bedrock of what the court needs to begin considering in this case. First of all, the decision below in our three cases was a two-to-one decision. There were only three FERC commissioners at the time. Where the two FERC commissioners that are in the majority that we believe should be reversed by this court and remanded to, again, couldn't even agree on their message. So, from a standpoint of deference, the agency itself did not speak in the most coherent way. We would argue that perhaps the single most important document for this court to read is Commissioner Massey's dissent. Commissioner Massey is no longer a commissioner, but addressed, we think, this case in a very coherent fashion. Let me begin by saying that in 1993, the Enron Company was granted the authority to make market-based sales of power. And in 2003, that authority was revoked. And let me read one paragraph of the order revoking that. That is a FERC order. And in that order, the FERC said, Enron, quote, participated in practices that manipulate prices so as to charge unjust and unreasonable rates. At another point, it says, quote, accordingly, we find based on the record in this proceeding that the behavior of the Enron power marketers constitutes market manipulation and results in unjust and unreasonable rates. We find the same conduct violates the express requirements in our orders, allowing the Enron power marketers to make sales at market-based rates. Now, why do we start with Enron? Because the totally dysfunctional so-called Western energy crisis that was talked about is not just the criminal conspiracy of Enron, but it is the dysfunction of that market. But Enron is at the core and part of this case. For the Nevada companies, we have approximately $600 million of contracts in this case. Over half of those contracts are with Enron. So when one looks at this case, every one of the contracts that the Nevada companies entered into were entered into in the period of December 2000 until June 2001. All are short-duration contracts for less than 12 months. FERC required refunds on spot market contracts for contracts in that same time period. Just before this case was decided by the FERC, by the very narrow two-to-one majority, the FERC staff report on price manipulation in the Western market was released, and that's in the record of this case. Let me read you a couple of quotes there because I'm going to tie those quotes up to how they are drawn together in the actual decision by the FERC in this case. The first quote is, the forward contracts prices, and all of the contracts that the three of us have at issue here today were forward contracts, were according to the FERC, quote, distorted. Specifically, the FERC report found, quote, forward power prices negotiated during 2000-2001 in the Western U.S. were influenced by the then current spot power prices. And then finally, the staff report says, quote, the influence of spot prices on forward prices was the greatest for forward contracts with the shortest time to delivery, one to two years. Those were exactly the Nevada. You said you were going to talk about the legal standard, and you've sort of gotten somewhat far afield because you're now talking about what the factual distinction, because eventually FERC, applying whatever standard it applied, determined that you hadn't made out your case with regard to the influence of the spot market on the forward market. Sometimes they seem to be saying that, and other times they seem to be saying you hadn't made out enough of an impact. And to that set of reasoning, it might matter whether we were applying a just and reasonable standard or a public interest standard. But first we have to know what standard we're applying, and then we can figure out what to do with these heads of facts. Yes? I think that's more orderly. Yes, and let me see if I can, I'll go to the law, which I hear the court helping me get to the point. But let me read you what the FERC said that links that particular staff report to the decision, and then let's talk about the legal standard. If the court had before it the paragraph 94 of the order in this case, which we think is the essential point at which FERC began to go completely wrong as a legal matter in this case, it addresses the staff report and then addresses the standard. It says the staff report, quote, found that the spot market distortions flowed through power prices, particularly those for contracts of a short-term nature, one to two years. In other words, it picked right out of the staff report and adopted that language. It then said the commission has already concluded that the California ISO and PX spot markets were dysfunctional during the relevant periods, and that rates in those markets were unjust and unreasonable. Evidence of market manipulation merely suggests yet another cause of those dysfunctions and the unjust and unreasonable rates in the spot market. However, and here's where we come to the law, Your Honor, a finding of unjust and unreasonable spot market prices caused forward bilateral prices to be unjust and unreasonable would be relevant to contract modification only where there is a just and reasonable standard of review. So what FERC said is don't look there, don't worry about what actually occurred, because the only way you could get relief in that way is under the just and reasonable standard. Now, let me go to the other points they seem to be saying that there just wasn't. They hadn't proved an impact at all. Would you say that's accurate? I would actually say that is not accurate, because in the paragraph 94 in the June 26th order, and again, I understand that. I said other points, not at that point, but at other points. I think the problem here is the conflation of an ALJ opinion that is relied upon often but is not adopted by the court. And, in fact, the ALJ opinion cannot be reconciled with the staff report. The ALJ opinion didn't find... But the staff report is not binding on the agency, is it? It is not binding on the agency except, and the reason why I wanted to point out to this Court is that it's adopted here within the context of this decision. And it appears, in fact, on page... It's adopted. It basically says, you know, no matter what they said, it doesn't matter. They didn't say that they were right or wrong. They just said it wouldn't matter in our theory of the case. They never reached the issue of how that impacts, because they say the only way you get there is just in reason. Now, let me address what I think is the dispositive legal issue that comes right to this issue. It's whether the consumers here can challenge and obtain a just and reasonable evaluation as the statute requires. In Farmer's Union, Judge Wald, and in Elizabethtown, Judge Ginsburg, writing for the D.C. Circuit, and in a number of other cases, such as Louisiana Energy, it's been made clear that FERC's authority to rely on market rates, which we do not challenge in this case, must depend on the existence of the just and reasonable prices being the ultimate statutory promise. In this case, the only way that FERC can justify and say that those just and reasonable rates have been obtained is because in 1993, and every three years thereafter, they gave Enron and the other companies the authority to sell at market-based rates. They say, when we made that judgment, the members of this court should accept from us that we were equating that with a just and reasonable price. And that is wrong. That is fundamentally wrong, and there is a disconnect between the promises that were made by the- It's wrong, or it doesn't account for changes in the market? Well, as the court in Lockheed- I think Lockheed, in the recent Lockheed case, basically said the basic system's all right, but it has to be-it has-there are-it's only all right if they abide by the provisions that are supposed to be assuring its continual validity rather than a validity that's three years old, and isn't that where we are? I think there are several quotes from Lockheed that go even further than your last statement, Your Honor, because I think what Lockheer stands for, the proposition, is that the court isn't going to buy the assumption that the mere existence of the authority to conduct sales at market-based rates means that they were just and reasonable prices, and there's a number of quotes- I'm not sure that's true. It seems to me the real problem is the last time. I mean, that is that you make a determination in 1996, as you say, and now the whole market's entirely changed, and they're still relying on that assumption. Right. And-but they're saying that you cannot go to the FERC anymore under Section 206 and actually apply for the FERC to make the determination whether the rates are just and reasonable, which is what the promise is in the statute. And we believe that- I mean, there are two ways of looking at it. That's a tougher way. The other way is-and you also can't go to FERC and ask them to determine in advance or at the relevant time whether the market rate-the conditions on which the market rate authority were issued continue or whether they've changed such that it shouldn't be there anymore. That's correct. And I think this-the Lockyer court has anticipated exactly where we are today. In other words, this is the next logical case from Lockyer because the Lockyer court said the mechanisms must be there to assure a just and reasonable rate and whether the market forces were truly determining the prices. And our- This is what I'm trying to clarify. Are you arguing that they have to, on a cost-based methodology, look-have available a challenge to the fair and reasonable rates or that they have to have available a challenge to the market rate assumptions that they're assuming are going to result in fair and reasonable rates? I thought-I felt-I at least tentatively read Lockyer the second way, although I wanted to be persuaded otherwise. It doesn't suggest that you have to go and do the old-style cost-looking at the fair and reasonable rates, but you have to do something. That's correct. I do not disagree with the court's reading-with your reading that what Lockyer promises us is the just and reasonable market rate, and that's what we didn't get in this case. This case is not about something that happened after we entered into the contracts. It is fundamentally that at the time we entered into these contracts we were denied a just and reasonable rate, that there was indeed no market rate truly available. And, in fact, I think that's exactly what Lockyer stands for. In effect, FERC-you know, FERC has the authority to make a rulemaking and to work through the problems of how their grants of market-based rate authority would work. There's not a point either in their decisional law or in their rulemaking authority where they anticipated where we are today, which is what happens when sometime during the period after the market-based rate authority is granted to someone and the point at which the revocation occurs, people can bring their cases to the FERC under Section 206 and get a review of whether the rates were indeed just and reasonable. Are you asking-why are you asking that? Is your complaint that there should have been before these contracts were entered into a review of this kind or that there should be one now under 206 leading to a refund? And if there is one now, what is it that you want them to look at now with regard to just and reasonable rates? You want them to look at the nature of the market at the time the contracts were entered into? That's correct. It is-we want them to look-frankly, it would have been better if FERC had been an active player and had not permitted the market to spin out of control in the way that it did. It protected the spot market. It stepped in and said, with regard to the spot markets, we're not going to permit this any longer. But what it never did was address the forward contracts. Sanctity of contract became a barrier to the evaluation occurring here. So, what we're saying is, yes, indeed, just as you said a second ago, we want the just and reasonable determination of what the market price should have been at the time the contract was entered into. Do you want them to look at the market price or do you want them to look at the condition of the market? We want them to look at the conditions of the market under the just and reasonable standard at the time of the inception of the contracts. Let me just say that FERC could have made these different trains of thought, the train of thought that permits market-based rates and the train of thought that meets their statutory responsibilities of just and reasonable prices, if they had indicated that there would be a rebuttable presumption that the market-based rate was deemed to be just and reasonable until it could be proven by us otherwise. In other words, you have to have a way of addressing this. FERC has given us no guidance on those issues. They simply said, notwithstanding the record, you're not entitled to a just and reasonable determination. Because, we submit, had they done so, frankly, these rates would have been radically restructured based on their own prior findings. With that, I'd actually like to call on Mr. Elliott at this point to address the contract issue, which we believe could be equally dispositive of at least the Nevada case and his case. And then he will call on my colleague again. Thank you. I'm Randolph Elliott, representing the Southern California Water Company. I'd like to pick up on a couple of the questions that came up so far. To emphasize a couple of points I think may have been lost. The first one is that there are no findings by FERC in our case. The dysfunctional California spot market did not affect the prices of these contracts. FERC said the issue was irrelevant. We're not going to look at it. The ALJ made some findings, but they're not adopted by FERC. FERC, in paragraph 94, which Mr. Ryan just quoted from, said the issue was irrelevant. We're not going to look at it. It doesn't matter whether the spot market pushed up these prices or not. That issue is irrelevant under the public interest standard we're going to use. Now, this case I think is different in that respect from the California Public Utility Commission case you're going to hear later in the day. But there are no findings by FERC on that point. They declared the issue irrelevant as a matter of law. So that is completely off the table. And let me get to the contract issue. The only legal justification that FERC has for importing the, for applying the public interest standard in this case is their interpretation of the Western Systems Power Pool Agreement. FERC has said that unless the parties expressly intend to apply the public interest standard, we won't, that the just and reasonable standard will apply. The only express indication of the parties' intent they found and relied on is a single sentence in Section 6.1 of the Western Systems Power Pool Agreement. Now, this Power Pool Agreement is unlike most contracts in that it really has two purposes. It's the bylaws, the governing document for an organization, the Power Pool. And then it has some standardized terms for energy transactions that the members of the Power Pool will use in trading with one another. So it has this dual character. FERC's orders completely ignore this. They assume everything in the Western Systems Power Pool Agreement is a standardized term that gets imported into individual transactions. Now, some of the standardized terms are these service schedules at the end. They say, you know, you can trade firm energy, firm capacity, or economy energy, and they specify what those are, and they're defined there. Now, the fundamental flaw in FERC's order is that Section 6.1 of the Western Systems Power Pool Agreement is part of the organization's bylaws. In fact, it's what you would expect to see in the bylaws of any organization. It's the description of how we amend the Western Systems Power Pool Agreement, how we amend the master agreement. It's not talking about how we amend individual transactions under the agreement. It's only talking about how the 200 parties to the agreement can amend the master agreement. We went through at length. What this whole discussion is going to, as I understand it, is whether there was a so-called mobile Sierra clause or not a mobile Sierra clause. Right. Does that matter? I mean, does it really matter? It might matter to FERC, but ought to matter, I guess, is what I'm asking you. Ought it to matter whether the contract, what the contracts say about how FERC ought to review them? I mean, this is a public question, and I'm not sure you can contract out of it this way. I would agree. I think the parties could not contract away the public's right. As a matter of law, mobile Sierra did not apply. I may go to that argument. The other thing I wanted to talk about, in fact. FERC really confuses the issue here. The issue here, as Mr. Ryan has explained, is about what happened at the time the contracts were formed. We're not talking about I signed a contract and five years later things have changed and I'd like to get out of it. We're talking about what happened when the contract was formed. Mobile Sierra doesn't have anything to do with that. In fact, the mobile Sierra doctrine assumes that everything was okay when the contract was signed. The Atlantic City Electric case from the D.C. Circuit summarizes the law. So that's the purpose of the mobile Sierra doctrine is to preserve the benefit of the party's bargain as reflected in the contract, assuming that there was no reason to question what transpired at the contract formation stage. Well, this whole case is about the contract formation stage. So applying mobile Sierra here, you've assumed away the whole case. The doctrine has no application here. And that's not only the D.C. Circuit's view. That's FERC's view. The Northeast Utilities case, the order on remand by FERC, it's 66 FERC Paragraph 61332, 1994, is probably the longest explication by FERC of the mobile Sierra doctrine, its origins, its purposes, that FERC has ever issued. And I would commend it to your attention because in that case they said in the typical mobile Sierra case, if the commission has accepted upon a finding that the statutory criteria have been met, the contract and the utility then seeks to modify. And by accepting the contract, FERC has satisfied its obligation to protect the public interest through its initial supervision of the contract. So they're protecting a contract that they've already had a chance to look at and assure themselves and assure the public that it's lawful and that the public interest has been protected. Because we don't know if anybody ever really looked at it. Pardon me? In mobile Sierra and in many of the cases before that, which are not under market rate authority, as I understand it, the contracts are submitted and they can be looked at, but we don't know if anybody ever really looked at it. Yes. Right. So it's not as if we know that there was a just and reasonable rate in the mobile Sierra, in the original mobile Sierra contract, for example. We know FERC could have challenged it, but there's no indication they did or they did officially approve it. So it's sort of a strange business. Well, in the Northeast Utilities case, which I commend to your attention, they tried to explain this sort of issue. And they say in the traditional case, the parties, I mean, we're talking in the Sierra case, it was a cost-based rate. And the parties filed it. There's the buyer of consent. Everybody's happy. There's no dispute about it. They've accepted it. It's in effect. And then later they- They could theoretically knock the just and reasonable rate and just nobody's noticed. That's true. That's true. But the customer could have challenged that if that was the case. Well, yes, but they agreed to adjust to a rate. And it could be that retroactively, when you look at it closely, you say, this is not a just and reasonable rate. It's much too high, much too low, or something. But in mobile Sierra, the successor cases, they are insulating that question from review, even if it were true. Yes. So how is this different? This is different because FERC had not discharged its obligation to protect the public when it accepted, for instance, Enron or Murren's market-based rate tariff for filing years before. The Lockyer case is relevant on this point because it says FERC hasn't discharged its responsibilities under the statute at that point. They have to do the subsequent monitoring and they have to have in place a remedial scheme to make sure that the market is working. And if it's not, to step in and self-adjust in reasonable rates. I think Lockyer is on all fours with the Farmers Union case from the D.C. Circuit and the other D.C. Circuit cases we cited in our briefs on that respect. If FERC doesn't have that authority to step in later, the initial grant of market-based rate authority is unlawful under the act. That's the holding of Lockyer. The FERC cannot deregulate rates. They have to, as a matter of law, retain the authority to step in later on. And that is why Mobile Sierra doesn't apply. Because if you apply Mobile Sierra at that second stage and it's this practically insurmountable public interest standard, you've rendered the initial grant of market-based rate authority unlawful because FERC has given away that necessary component, that necessary condition that was inherent from their initial grant of market-based rate authority. So by applying Mobile Sierra in this case, they can't apply it in this case because to do so would render unlawful the initial grant of market-based rate authority. Unless the Court has questions on that point, I'll turn it to Mr. Christensen who will explain the defects in FERC's public interest analysis. Thank you. Good morning. My name is Eric Christensen. I'm Assistant General Counsel at Sonoma County PUD, which I guess means I'm not on the clock this morning, but I'm salaried, regrettably. We sympathize with you. I'm sure you do after reading all the briefs in this case. As Ms. Gelliard indicated, I'm going to focus on FERC's flawed public interest rationale. The fundamental flaw here is that FERC's conclusion here is that they don't even have to look at whether the markets giving rise to this contract were manipulated and subject to criminal fraud. They say that that is irrelevant under the public interest standard. We believe that it takes the very heart out of the statutory scheme that Congress had in mind. There's no mystery about what the public interest that Congress was trying to protect. For example, in the FPC versus Hope Natural Gas case, the Supreme Court said that the Federal Power Act was plainly designed to protect consumer interests against exploitation at the hands of private interests. Again, in the Bill States Utility case... In the PTC case, I don't remember if they said it here, FERC said that bad faith duress and so on could be relevant to the application of the public interest standard. Did they repeat that here? I don't remember. In this case, they say it's only relevant if it is specific to the contract at issue, whatever that means. We believe that's directly contrary to Lockyer because the Court here, this Court in Lockyer, said that the market giving rise to these contracts has to be properly functioning and producing something approaching marginal cost rates. If it's not, then the contracts are per se unjust and unreasonable. I guess more to the point is that if you look at the purposes animating the statute, which are to protect consumers, to provide another quote from the Supreme Court... Did you ever put on a record... Pardon me? Were you allowed to put on a record and did you put on a record with regard to whether the forward market rates, especially the short-term ones, reflected something like marginal cost rates? Yes, we were. And if you look at the testimony we submitted from Robin Adams, for example, which I believe is 53 or 56, I forgot. But in any event, Mr. Adams examines the market. He concludes that marginal costs for a contract like ours and the Southern California water contract should reflect the long-term marginal costs of building new generation in the West. And in fact, the contracts that we have are three to four times that amount. So the evidence is never addressed by FERC. FERC never looked at that because it wasn't relevant to their theory of the case. FERC just never looked at that. FERC never looked at that. Right. As Mr. Ryan pointed out, paragraph 94 of the June 26th order says we don't have to look at that because these are contracts to be evaluated under the public interest standard. And I think that my colleagues have indicated the public interest standard shouldn't apply because this is a review in the first instance of these contracts. But in any event, how can you say that manipulation of the markets and whether the markets were properly functioning is irrelevant to the public interest when the very thing that Congress was intending to regulate was abuse by private utility companies? Abuse is very common. And in fact, FERC, we've cited a number of instances in the past where FERC has cited market dysfunction and regulatory changes as reasons for acting to modify contracts under the public interest standard. Those cases aren't even mentioned in the orders, let alone does FERC explain how they can be reconciled with what they did here. So the orders are per se arbitrary and capricious. One example we've pointed out is the Supreme Court decision in FPC versus Louisiana Power and Light. In that case, the issue was whether FERC could require the modification of contracts that provided for, excuse me, that had to do with curtailment of natural gas supplies where there was a natural gas shortage and FERC had imposed a nationwide tariff that protected individual residential consumers, hospitals and schools, exactly the people that we're trying to protect in this case. And the Court concluded that the Mobile Sierra doctrine was no bar to modifying the contracts in that case because the FERC was acting to protect the public interest, citing the Mobile case and, or excuse me, yes, citing the Mobile case, correct. And it's the same public interest that the Supreme Court had in mind. If you look at the Sierra case, they specifically cite Section 201 of the Act, which says that the business of commerce concludes that the business of selling electricity and interstate commerce is effective with the public interest.  Didn't FERC find that, I believe it found that in some instances the rates increased to consumers, but in others it didn't increase at all? I don't believe that in these orders did FERC address the rates at all. They just said... It did. We assume that there was market manipulation in California markets. We assume that it protected the forward market, but we nonetheless conclude that that's in the public interest. And to, let's see, I think the evidence that we submitted is very clear that there is a huge public interest problem with these contracts. For example, we submitted evidence from individual consumers in our service territory. For example, Mrs. Linda Harris, which begins at AR 951, discusses how the rate increases she experienced during the crisis almost doubled her bills. She's caring for her elderly mother who received a bill of $747 on a $1,500 a month Social Security income. We discussed, we submitted testimony from the Icos Corporation, which is one of our industrial customers that's in the business of developing new drugs. The evidence there demonstrates that the huge increases in electric rates that they experienced during the crisis has interfered with and hindered their development of new therapeutic drugs. For example, they have in development a drug that would treat septic shock, a condition that kills 200,000 people a year in the United States. The huge rate increases that they experienced forced them to divert money from developing that drug to pay their electricity bills. These are exactly the- We had a discussion at ER 236 of the final order of the impact, what I understand to be the impact on ultimate rate payers. And it says that the contract term is imposing excessive burden on their customers. And I believe the conclusion is that for the Nevada companies, there were rate decreases of 20% for retail service in 2003. And so, I mean, anyway, there is a discussion and the conclusion is that there was no excessive burden. I think the FERC's rationale is really incoherent here. In the case of the Nevada companies, there was- You said they didn't do it. I mean, they did do it. You're not disagreeing with what they did. They didn't do what? I'm sorry. You suggested, as I understood it, that they did not look at the impact on-actual impact on rates by consumers. But they did it. You just don't-you just disagree with- No, they didn't. What they didn't look at is whether the market tipping rise of these contracts were the product of dysfunctionality, market power abuse, and so on. They did examine the rate impacts. I think in the case of the Nevada companies, they said there was a rate decrease, but didn't examine the question of whether, if the contract had been the product of a properly functioning market, whether the burden on Nevada consumers had been reduced. In our case, they said, well, there was an 8% rate increase just from this one contract, but that doesn't matter. It doesn't affect the public interest. And, in fact, that's directly contrary to the repeated conclusions of the Supreme Court and other courts that have examined the issue. They've repeatedly rejected that very kind of analysis where FERC says this is only going to cause a little impact to retail consumers, and so it doesn't matter. The FERC says-or, excuse me, the Supreme Court repeatedly has said a little illegality is not allowed under the Act. I think we'd like to reserve the rest of our time for rebuttal. Thank you. I wasn't quite sure everyone was done yet on this slide. Lorna Perry for the Commission, Your Honor. Also, I have with me Dennis Lane from the Commission, who is prepared to address any questions you might have about the Snohomish Due Process argument since they weren't raised at all on the petitioner's side. I don't know whether the Court will have any questions on that, but he's available to address those if you do. And also is Ken Irvin, who's representing the interveners on behalf of the respondent. And, hopefully, I will be able to reserve him 15 minutes of time at the end of the argument in order to address on behalf of the interveners. The Mobile Sierra Doctrine. In Mobile Sierra, the Supreme Court found that the SPA allows parties to fix rates by contract. And once the parties fix those rates by contract, the parties themselves cannot unilaterally change those contracts, just as they couldn't change any other contracts unilaterally. And the Commission reserves its ability to protect the public interest with regard to those contracts. But the Commission can only modify the contract if it finds it in the public interest to do so. And Sierra was quite successful. When you're saying unilaterally, one thing I noticed is that Mobile Sierra is talking about unilaterally, meaning one party to a bilateral contract, not both of them, right? Together, they can agree to change the contract, Your Honor. Yes, that's right. And so the focus is really, essentially, whether one party can, quote, reach the contract. The focus is really not on whether the agency, you then say, well, but the agency can alter it in the public interest. So at least it's an exception. This was really simply a rule that says that a party can't walk away from its own contract, and not a declaration of what FERC can or can't do. Oh, no, Your Honor. In Mobile, what the Supreme Court said is exactly what you're saying, which is once they enter into a contract, neither one of the parties can unilaterally change it. In that case, it was a pipeline, but, you know, it's been later applied to both parties. But in Sierra, what the Court said was we find that the Mobile rule applies under the FTA, but we also have here the additional question of what does that mean with regard to what the Commission can do with respect to a contract. And they looked at the statute, and the Court interpreted the statute to provide that because the statute says the parties can agree to fixed rates by contract, that the Commission is limited in modifying that contract to the public interest, that it's not the private interest of the parties that the Commission can take into account in deciding whether to modify that contract, but it has to be an independent public interest that the Commission is furthering. And that was the burden of Sierra. It was an extension on the Mobile rule to address the question of, well, what does it mean once they set a contract rate, what does that mean for what the Commission can do? And they were very clear about the Commission can only, when looking at whether the contract rate is unjust and unreasonable under 206, the Commission's consideration is limited to whether it is contrary to the public interest. And you can see this analysis in the Commission's order. For example, in the rehearing order at paragraph 15, which is in your excerpts of record at 397, the Commission discusses the fact that once a party signs a Mobile Sierra contract, the Commission is limited to, in modifying that contract, determining whether or not the contract is in the public interest. And once the Commission is looking at the public interest, And here, petitioners are basically asking for contract modification on the basis that the contracts were not just and reasonable when they entered into them. But what that means, I guess what this really, my comment gets to is whether it matters whether you have third parties who are involved here. Because the statute doesn't say, the statute talks about just and reasonable rates. There is, as between the parties, it's one thing to say, well, they can't complain. But the Commission still has the responsibility to determine just and reasonable rates if anybody else is going to be affected. And that's really all the public interest standard means in English, as opposed to what FERC has spun out that it means in some detail. So if you have some rate payers who show up and say, well, these parties may have agreed to that rate, but that rate is costing us a fortune. And in fact, it was all the result of a manipulated or dysfunctional market. So you have to look at this and determine whether there was a just and reasonable rate. That doesn't answer what just and reasonable rate means, a cost-based rate or a market-based, a functional market-based system. But it does mean that if you just take a test on its face, it would appear that that review has to be available at some point. Does it not? I guess that's my short answer. No, Your Honor, not in the context of a Mobile Sierra contract. For example, if you look at page 355 of Sierra, at the conclusion of their discussion of what it means to look at one of these contracts as whether or not it's just and reasonable under 206, the Supreme Court says, when 206A is read in light of this purpose, it's talking about the 201 public interest purpose, it is clear that a contract may not be said to be either unjust or unreasonable simply because it is unprofitable to the public utility. And when you look at the factors that Sierra was looking at... Well, if it's not profitable to a public utility, it's rarely going to have an effect on rate payers. But look, this is a low-end, high-end problem. But when you're dealing at the high end, i.e. it's too high as opposed to too low, it's more likely to have an effect on rate payers. And where in the statute could you get the authority to say, well, we're just going to ignore that? Well, because the public interest is not just and reasonable in the sense that just the rate is too high or too low. And what Sierra was saying is it has to be an excessive burden on consumers. For instance, if you look at the Pepco case where the D.C. Circuit looked at the issue of rates in the context of a buyer claiming that the rate was too high, In Pepco, the buyer was paying a contract rate that was twice the just and reasonable rate that the utility was charging under its open access tariff. And they came in and said, you know, it's an unjust and unreasonable rate. Look, everybody else is paying half of what we're paying and we want our contract modified. And the court said, the commission said and the court affirmed that that's not sufficient to show public interest because they didn't show an actual impact on their rate payers. Just the fact that a rate might be too high or too low doesn't mean that it's contrary to the public interest. You have to actually look at the burden that's being caused on the public, not the effect on the utility of the parties to the contract. But if you show that burden, at least as the commission seems to have interpreted in this case, the burden has to be not simply higher than a just and reasonable rate but, quote, excessive, which seems to be some increment, which we're not told what it is, more than simply a non-cost based just and reasonable rate. Where is that coming from? One thing is I have to point out, Your Honor, the commission looked very carefully at the burden on the rate payers. As you were alluding to earlier in the argument, the burden on rate payers in this case. And the commission said, I mean, you know, a contract that results in a rate decrease for the Nevada companies and for a no rate increase for the Southern California Water Company didn't have to get to the level of saying, well, you know, at what point does the burden become so great? Because they didn't show anything that would qualify as an excessive burden on the rate payers. And so the commission never got to the point of quantifying, well, what would constitute an excessive burden? Because in the context of this case, it wasn't ever ready to do that. Did they ever do any kind of cost based, either, either, a cost based analysis of the rates that were being paid to see if they were somewhere in the vicinity of the zone of reasonableness of a cost based reasonable cost or a market based analysis as of the time that the contract was entered into rather than years, some years before. Either of those things ever done? The commission looked very hard at this case at all the circumstances surrounding the contract, which included whether the market manipulation and the spot market and those sorts of things actually had any impact on the contract. But the ultimate answer was we don't have to answer that question, because that would only be relevant if we were doing adjusted reasonableness standards. But we're not. Wasn't that what that paragraph said, which was exactly the one I had picked out as well? Your Honor, it's specifically in that paragraph they were addressing the question of the staff report. And the question of the staff report was whether if you interpreted the staff report didn't find any contracts unjust and unreasonable, but they said that there was a price impact going from the spot market into the forward market. And the commission was making the point in that paragraph that the petitioners are basically saying that their contracts are unjust and unreasonable. And even if you assume that that's what the staff report meant, that's not enough to prove their case. I'm sure that some of the petitioners in this case are not parties to the contract. I'm sorry, go ahead. Some of the petitioners in this case are not parties to the contract. Well, the petitioners, the actual petitioners here are the parties to the contract.  Some of the state commissions are. Okay, so they're not all parties to the contract. Some of them are representing rate payers, actually. Right, Your Honor. Okay. But the other thing you have to consider is that the commission looked at the, for example, on the issue of manipulation, as they were talking about, you know, they were talking about Enron earlier. The commission, well, first of all, the ALJ and the commission affirmed these findings, found that there was no evidence of specific manipulation by any respondent that impacted the foreign markets generally or any contract specifically. And I'm sorry, this is from, you can see this at the order on initial decision, which is paragraph 45, which is at 218 of your excerpts of record. The respondent witnesses refuted allegations that Enron manipulation in the ISOMPIC spot markets inflated forward markets. There was no evidence showing withholding by any respondent, spot or forward market. There was no evidence showing any seller engaged in any discriminatory pricing of contracts. And then in the re-hearing, well, in the order on initial decision at ER 241, paragraph 109, and then in the re-hearing at paragraph 65, which is at ER 413, the commission found, based on the record and the ALJ's findings, there was no evidence that market manipulation specifically affected these contracts at issue. I mean, the commission looked hard to see whether there was something about the dysfunctional. I'm sorry, in paragraph 65 of the re-hearing order, it's at ER 413, the commission affirmed these findings that there was no evidence that the market manipulation specifically affected any of these contracts at issue. And there were similar findings made with respect to whether there was any unfairness, bad faith, or duress. For example, in the order on initial decision, paragraph 11, ER 241, the commission looked. Am I correct in understanding that the commission never determined whether there was a full dysfunctional, one of the dysfunctional spot markets impacted the forward market in such a way as to influence the rates that were being paid, at least in the short term, in that market because they said that doesn't matter because we're not applying a just and reasonable standard? Is that accurate? That's right, Your Honor. They did not determine, purport to be determining just and reasonable rates in these contracts. And specifically didn't decide, therefore, whether the admitted dysfunctional spot market resulted in some cost impact in the forward market because they said that wasn't pertinent. Right, Your Honor. Because under the public interest standard, it's limited to whether there was a public impact such as excessive burdens on consumers or something that was likely to cause financial distress for the petitioners or there was an unduly discriminatory contract that would be discriminatory to people who, third parties, you know, competitors, other people. For instance, unlike in the PUC case we're going to talk about later, there wasn't, I believe, and you can tell me if I'm right or wrong, there was no, we're not dealing in California where there was a freeze on the consumer rates. So it's just ordinary market theory would suggest that if there was an impact on the cost of the people buying the energy and then selling it to the utilities or if the utility is buying it, essentially it's going to impact on rates. In other words, they may not have been going up, but they may have been higher than they would have been if there hadn't been a market dysfunction. That's possible, Your Honor. But this is the point exactly that Boston Edison made, that the First Circuit made in Boston Edison. At 233 Fed Third, their point was a rate may be so high as to be unjust and unreasonable, but that doesn't mean that it's not in the public interest. And in the first instance, it's the commission's duty to determine when the impact is so great to be contrary to the public interest. And in this case, it looked very hard at the impact on petitioners, on consumers, on third parties, and did not find that the public interest was implicated. And if I may just make one point about the staff report, because it keeps coming up repeatedly, the staff report said that with regard to short-term contracts, there was some effect. And now, the commission never said about the base findings as you observed before, but even under the staff report analysis, for example, the Snohomish contract is a nearly nine-year contract. Many of these were short-term. Many of these, and a lot of companies. But at this point, the one contract that the petitioner, Snohomish, is suing over is the- So that may lead to the conclusion that you go back and you divide up the results, and some of them are okay and some of them aren't, but you're applying a different standard than was applied here. So the fact that there might have been an impact on some of the contracts would be enough reason to reverse it, at least in part, or probably in a whole, for the agency to look at it again under a different approach. Oh, no, I understand, Your Honor. But I'm just saying that they seem to assume that all of the contracts would be unjust and unreasonable under the analysis in the staff report. I want to know if some of them would be. Some of them. Some of them fall, yes, ma'am. They do. Some of them fall within their short-term contracts. Nevada Company's contracts, in particular, are short-term contracts. But as I said, I mean, the Commission tested for an extensive hearing and looked very hard into the circumstances of all of these contracts. And because the public interest standard, as it has been interpreted by the court, has been applied only to excessive burdens on consumers or matters truly impacting the public interest, as opposed to simply that a rate was higher or lower than it would have been had it been a just and reasonable rate. The case law is quite clear that just the fact that a contract becomes unjust and unreasonable or is unjust and unreasonable at the outset is no reason to modify the contract unless it has These are quite different, aren't they? Whether it was unjust and unreasonable at the outset as opposed to becomes unreasonable. Well, the point is, though, Your Honor, the Mobile Sierra protection, if you will, or the Mobile Sierra standard attaches when the contract is signed in the first instance. And it doesn't have to do with whether or not it was filed with the Commission or approved by the Commission in the first instance. You mean that if it was required to be filed and wasn't filed, and therefore the Commission had no chance to challenge it in advance and was on the list, the subject of Mobile Sierra, is there any theory for that? Sure. And first of all, Your Honor, the Commission made this point itself in the order on initial decision at paragraph 7 in note 14, where it cites for Grishman Power and Light, which is 481 FedSecond at 493, and the Borough of Lansdale, which is 494 FedSecond at 1112. And the Mobile Sierra has been extended to in both of those cases. The Mobile Sierra public interest standard was extended to contracts that were not on file with the Commission. And, in fact, in the Borough of Lansdale, the court made the point in note at 1114. How does that possibly comply with the statute? Because it goes back to Sierra, Your Honor. The point being that you have to start with the concept from Mobile, even, that the parties are allowed to set rates by contract. Yes, but they're not allowed to violate the statute by agreement, are they? No, but, Your Honor, that's what Sierra means. This part of the- It doesn't mean that as long as they initially comply with the statute.  Your Honor, what Sierra says at 355 is that in the concept, when you're looking at a Mobile Sierra contract under 206A, the contract cannot be said to be unjust and unreasonable simply because it is unprofitable to the public utility. In that case, the Commission has found that it gave too low a rate of return to the public utility, and, therefore, it was unjust and unreasonable. And the Sierra court specifically said, even if you accept that statement as true, the Commission is applying the wrong standard. The contract can only be unjust and unreasonable to the extent that it is contrary to the public interest. You cannot say that the contract is unjust and unreasonable simply because the return to the public utility is too low. And so it's not a question of them at any point being in contravention of the statute, the point being that the statute allows the utilities to set rates, And Sierra specifically says that parties can agree to unjust and unreasonable rates as between themselves. The only question the Commission can look at is whether it impacts the public interest. And that's exactly what the Commission did in this case. Is there a public interest language in the statute? In Sierra, specifically, the public interest language comes from Section 201, which is what the Supreme Court used to interpret what means of the purpose provision. Right, Your Honor. It says that the Commission is acting in the public interest, and the Supreme Court, in interpreting what 206 means in this context, said that it means that unjust and unreasonable in the context of a contract between the parties setting the rates is, whether or not, contrary to the public interest. Anything else? I can address the issue of contract interpretation of the WFPPA 6.1 if the Court has any questions about that. But otherwise, if there's nothing further. Very helpful. Thank you. Good morning, Your Honors. May it please the Court. My name is Kenneth Irvin. I'm with the law firm of Morrison and Forrester. I'm here on behalf of El Paso Merchant Energy, one of the nine suppliers sued by the Nevada Power Company. And I have the privilege of speaking on behalf of all the suppliers in this case who have intervened in support of the Commission. Your Honors, as I was listening to the argument this morning and in preparing for today, I'm reminded of what my first-year property law professor taught me a long time ago. What was his name? Let's give him credit. Samuel Fetters, Your Honor. Who? Samuel Fetters. That's E-T-T-E-R-F. He was a long-tenured professor at Syracuse University and a personal mentor to me. He told us at the end of class that there will come a time in your career, probably more often than you're prepared to accept, where you won't know what the answer is to a difficult legal question. His advice was to step back and think about what makes sense, what's fair, what's the right result. When I apply that rule here, it's clear to me that this is a case of buyer's remorse, that there is no justifiable grounds to relieve these buyers of their freely made choices. The problem is, this is how I understand it. On the one hand, they had the very act of entering into these forward contracts, both here and in California, seems to have had an impact on the problems with the spot market, but they were still operating within a market that every, at least an adjacent to a market that everybody agrees was dysfunctional and manipulated at the time. So, to say that they had buyer's remorse is really to ignore, and what's most troublesome about this is whether the commission has ignored the fact that they did the best they could under the circumstances. Well, they didn't do the best they could. You said they could have done better, but one way or another, they were operating under very difficult circumstances which were not of their making. And the question is, yes, they're unhappy with what's turned out, but they were presumably unhappy with the situation they were in at the time they entered the contracts. To begin with, the question is, really, does FERC have some obligation to look at those circumstances or those to be ignored entirely? That's the way I'm seeing the problem. I agree. FERC does have an obligation to look at those circumstances, Your Honor, and I do not believe that they have been ignored. What does your professor say for the first part? Step back. Look at the matter before you. Consider what's fair, what's right, what makes sense. All right. And then stop there and do that. Well, Your Honor, the problem in the California centralized markets, what the so-called, I don't want to use the word so-called. It's a troublesome word today. The power exchange market and the California independent systems operator markets was this over-reliance on spot markets. At times, 30% of the native load in California was bought in a spot market. The commission, the FERC, recognized that that was a problem, and so they took steps to move that load into the forward markets. The commission understood at the time that prices in the forward markets would rise because of that. It's a natural reaction of a competitive marketplace that when new demand shows up, prices rise. That's important for a market to function because then we have a competitive marketplace. Forward markets were competitive and functioned appropriately. Prices were high. I don't dispute that. Everyone acknowledges that they were historically high. Did FERC ever look at that question? I mean, that's what's bothering me. Yes, Your Honor, FERC did look at the question. Or did FERC say that it's not a relevant question? I do not believe it said it was an irrelevant question. What FERC looked at is whether these buyers had choices, and they found that they had robust choices. But they had choices within the context of what they were starting out with, which was extremely and abnormally high rates in the spot market, which meant that they were going into the forward market to avoid those. It just seems to me intuitively and logically, at least in the short run, we're going to be contracting for rates that were influenced by the rates in the spot market. Now, how can that not be true? And the staff report suggests it was true, at least in the short run. I understand not in the very long run, but at least in the short run. You need to understand that prices are a signal of supply and demand conditions. A spot price is a signal of our expectations today of supply and demand conditions. A price for a forward contract is our expectation of what the supply and demand conditions will be in the future. Right, but if you're looking at what the supply and demand conditions are going to be in three months, you look at what your alternatives are. One of your alternatives is the spot market, and if the spot market is way high, you're going to be willing to pay more in the forward market to avoid this abnormally high spot market, so it's being influenced by the spot market. And that, Your Honor, is a functioning competitive marketplace. That there is tight supply and demand conditions and high prices is what happens in a competitive marketplace. But it's a competitive market that is being generated by a non-competitive market. Well, and therein lies the central crux of this case. The grovelment of the complainant's case here was that the dysfunction in the spot market caused a dysfunctional component in the forward contract prices. My understanding is that's the question that the agency refused to answer in paragraph 94. Am I wrong about that? I read the opinion. The order's a little different. I think it's the question. Why am I wrong about it? Well, I believe that the commission, as it pointed out in paragraph 19 of its rehearing order, is that when buyers have choices, reasonably alternative choices, that shows us that competitive... But they had choices that are a little higher than they ought to be. Yeah, how did they have choices? They asked for bids and they got... They had choices, and the cases were better. But the choices were all higher than an ordinary, than a proper market would have generated. So if all of them are... Your Honor, you've assumed away the problem there. You said all higher than a proper market would have generated. That's not shown on this record. The forward market, the analysis made here shows... No, I think it's because FERC refused to answer that question. That's really what I want to know. It may be true that it wasn't generated, but that, as I understand it, is the question that FERC refused to answer. Certainly that's what the petitioners make out of the commission's decision. I don't think it's a fair read of that. Because what you just said is they had a competitive market among themselves, yes. But what about what they were starting from? They were starting from a competitive marketplace. They had to come forward, the petitioners had to come forward and show that some component of their forward price was dysfunctional, was attributable to something other than supply and demand conditions, and they did not do that. They, you know, they admitted that we were price takers, that we did not set the price, that the price was specified by they were, by the buyers. They acknowledged that we don't have market power. They acknowledged that they entered into these contracts with their own volition. They had scientific analysis. They were fully skilled in the arts. They're professionals. They've been in this business a long time. Yes, prices were high, but that was because of supply and demand conditions, market expectations in the forward marketplace. Nothing has been established in this case that shows any of those prices were the result of manipulation, fraud, duress, bad structure. So are you saying, and, you know, maybe you're right, but it's your position that the, it doesn't matter whether the spot market had this effect that I was suggesting seems intuitively likely and that the staff report says was also likely, i.e., that everybody was starting from a heightened, I'm sorry. Because the answer is it doesn't matter or it didn't happen or what? Respectfully, neither. The answer is that it was expected that prices would go up in the forward market when the commission mandated that people move buyers from the spot market into the forward market. That's natural. That's to be expected because you needed to lure those suppliers into the forward market. So prices need to rise to provide that appropriate signal. It seems to me there are two components. One is there are more people operating in the forward market, so there's more demand in the forward market, so the price is going up. But the second is whether the price is going up from an already inflated price because also another choice among people in the market is to deal with the spot market rather than the forward market, and that is also inflated. And that's an important point to focus on because, Your Honor, the fact that there was this dysfunction that was observed in the spot market doesn't by itself prove that people would expect that dysfunction to exist in the forward market. Indeed, here you have these uniquely structured single-price clearing auction mechanisms in the spot market that were not replicated in the bilateral market. Did Burke say that that effect didn't happen, or did it say it doesn't matter? I believe that the commission found that the forward markets were workably competitive. I believe that it was the petitioner's burden of proof to say, here's why we can have – What was Burke's conclusion on that question? That it was competitive, and the basis for that – Can you read us the – Sure. The commission starts by explaining in paragraph 19 of the re-hearing order is one place where the commission explains that when buyers have choices, that shows us, that proves that the competitive forces will appropriately discipline prices. Next, the commission found that there were lots of choices available to these buyers. In the case of Nevada companies, they dealt with 30 or 40-some-odd different suppliers using brokers on a blind basis. They would engage their broker to buy power at a price, and then without knowing who was the buyer, my client and others would say, yes, I agree to sell at that price. In the case of Snohomish and the Southern California Water Company, they had an RFP process. They crafted it themselves. They were advised by outside consultants. They were advised by their professional staff about how to conduct this process. They made choices. All of that was voluntary. They chose from among reasonable alternatives. How do you think Lockyer impacts on your analysis? I don't think it is applicable here, except to the extent that it says market-based rates are authorized. Right. The Lockyer case concerns market power. This analysis or this focus, this continuing monitoring obligation is focused on, does the grantee of market-based rate authorization have market power? Has anything since we granted the authority changed such that that entity has market power? Market power is not alleged here. It's not part of the gravamen of the complaint in any regard, and we don't have market power. Second of all, Lockyer, the concern there was a spot market type of transaction and reporting. These are all forward contract cases. A lot of them were for delivery after April 2002, when the commission issued its order defying Lockyer and prescribing the reporting, prescribing, you know, clarifying the reporting requirements, and these contracts all went to delivery after that, by and large. So I don't think Lockyer stands for the proposition that anything needs to be reversed or remanded here. To me, you know, it's important here to focus on the fact that they had choices, and they made a deliberate plan with what they were doing. One of the things that's been omitted here is, thus far in the discussion this morning, is in the case of the Nevada company, their own state utilities commission found the company was speculating unreasonably in the power markets. The Nevada company was buying more power than it needed to serve its native load, its retail load, and it was doing so basically for two reasons. One, it had made a ton of money in 2000 going long on power and selling it into California at the same high prices as everyone else on the tie of $750 a megawatt hour. Two, the Nevada companies were worried that the marketplace would get wind of their true state of financial affairs. They were trying to outmaneuver the marketplace. They were trying to lock in as much supply as they could before the market realized that their credit was actually worse off than that was being presented. And so they were trying to game the marketplace themselves. And it worked for a while. Like I said, they made about $100 million in 2000 using this technique, and then the marketplace moved against them. In the case of Snohomish and Southern California Water, the commission there also found that those parties actually made money reselling power they bought from the contracts at issue here and had, in the case of Southern California Water, opportunities to contract. Well, it certainly is going to pay a refund they got, but I don't know what else it does. I'm sorry, go ahead. That would certainly have an impact on any refund they got, but I don't know what else it would do. I mean, if you thought there was a problem here, the fact that they were playing both sides of it might tell you something about the ability of individual power companies to get. It's very important, Your Honor, because it gets back to the point you've been focusing on all this morning about the Federal Power Act protects the public interest. The Federal Power Act says when parties who know what they're doing, who are admitted to the hotel markets opportunity to transact club, then their private interests are locked up by that contract. But if there's an adverse public interest, then yes, the commission will step in and reform the contract. So here, the complainants tried to present a case that there was some public impact, and they couldn't do it. In fact, that's why they're standing before you asking for this other standard of review, which, honestly, Your Honor, it's got a bad name to it. The statute is the statute. It must be complied with at all times. How we measure compliance is a difficult question at times, perhaps. But where you have a fixed-price contract where the parties entered in that contract understanding those risks, then as between those two parties, the contract binds them. If there's an adverse public impact, then the commission can reform it. Some of the parties here are not those parties. Am I right? Exactly, Your Honor. And it's for them the public interest standing exists. The public interest test exists. And if you think about it in terms of... I understand this case well, but I just have a very hard time understanding. When the statute says that they're supposed to be charged just and reasonable, that the wholesale rights are supposed to be just and reasonable, and that's what's supposed to go into the consumer rates, why isn't that what they're entitled to as opposed to something else? Well, when you say the statute requires... They gave the PUC in this case. Sure, sure. When you say the statute requires a just and reasonable rate, the next question is... 205 and 206 say that. Absolutely, Your Honor. And the next question is, well, what does that mean? Or how do you measure that? What is the burden of proof to show that it does or does not comply with the statute? Well, in the case of a rate payer, a third party, a public utility commission, that's why we have the public interest standard. If you think of it in terms of normal judicial standing... Apparently, PUC says they don't have to look at the just and reasonable rate. They said it quite explicitly. However, a finding that the just and reasonable stock market prices cause forward bilateral prices to be unjust and reasonable will be relevant to contract modification only when there is a just and reasonable standard of review. And they're saying that without regard to who is complaining. And what they mean, what the commission means there, is they're not looking at the private interest of the parties to the contract. But they have considered in these orders, robustly, Your Honor, the public impact that these contracts have and whether it's material enough to warrant reformation. When you think about these standards of review in terms of normal judicial standing, what standing does a public utilities commission have to stand before court and complain or stand before FERC and complain about a contract unless there's been an impact on the public? If the impact is only felt on the private parties to the complaint, then that public utilities commission doesn't have standing. That third party doesn't have standing. There's no injury in fact. The injury, if any, exists. It's only between those private parties. That's why we have the public interest standard. How do we know here that there was no impact on the public when we haven't looked at what the FERC has not decided what the just and reasonable rate would have been in either sense of just and reasonable? And therefore, how can it tell what the impact of what would have been a just and reasonable rate is on the parties? We have some information about whether the rates went up or whether they went down, but not whether they would have been different if there had been a just and reasonable rate. Your Honor, I think we're, again, we're getting tied up in this bad language. These cases are, they do a poor job of explaining it, and I hope that this panel will make it clearer. I expect it will. I'm really listening. Your Honor, what you're thinking about is how does FERC know that when these parties, in the case of El Paso Merchant Energy and Nevada Power, we contract the rate that's specified in that agreement complies with the statutory mandate that the rate be just and reasonable? When FERC said specifically in the Statutory Regulation, I'm not going to answer that question. And in the context that we are reading from the Commission's order, they're talking about the private interest there. And so when, the answer to that is that when I don't, when I lack market power, when I am a price taker, when I am not free, I am not empowered to hold rates above a competitive level for a sustained period of time, and I contract with somebody who is equally not, does not have market power, both of us are contracting in the ordinary course, at arm's length, with no fraud, duress, or coercion, or even bad faith, then the resulting rate is just and reasonable. The Federal Power Act trusts, it contemplates a system in which wholesale energy market participants are skilled in the arts, know what they're doing, and can set rates that will be reasonable and appropriate. If in the course of doing that, their rate has an adverse impact on the public, then Mobile TR teaches us that the Commission comes in and reforms those contracts. I'm having a hard time, because I just read this sentence, which the works seem to say quite the opposite. They seem to say we're not going to worry about that. It's not that we've decided that they're just and reasonable, we've decided it doesn't matter. Well, Your Honor, the reason, you know, I don't, I think that the Commission has concluded that it was, there was a workably competitive marketplace for forward contracting, and that, therefore, it's appropriate to presume that these contracts were just and reasonable for all the reasons we have market-based rates, and that it was incumbent on the complainant to show that that wasn't the case, to prove this causal nexus that we've been talking about between the spot markets and some component of the forward contract prices that they function on. Well, maybe there was remand, and you can go back to FERC and make that argument, and maybe this time they'll agree with you, but it doesn't look like they did agree with you. Certainly, you know, we did ask for rehearing and clarification, and if I had my way, I could write a better decision by the Commission, yes. It doesn't quite work out that way for us, but I don't think a remand is necessary, Your Honor. First of all, there are no serious factual disputes here. The factual record is everyone pretty much acknowledges it. The question is the application of the law to the facts, and even if you have trouble with the way the Commission articulated its disposition of the causation question, there's still the injury question, and whether the impact was sufficient to warrant relief here. And it's clear under Mobile Sierra that where you have a fixed-price contract, that we need to find an adverse impact on the public, and there has been no showing. Again, pointing to Nevada as the imperative. There's been no adverse impact to the public. No adverse impact associated with a contract that, you know, is – there's been an adverse impact in the sense that prices were higher, yes, Your Honor. I didn't agree with that. Prices were higher, and, you know, correct me if I'm wrong, but as I recall, the state of California, the governor and some of the others, they stepped in. They started filing this, and, you know, a very, very heavy debt was incurred. You will hear more about that from people. And that has an impact on the public. If you don't have the money, you can't help the schools. You can't take care of the roads. You can't take care of people's medical needs. Well, and if there had been such showings here, Your Honor, there may be – because there's been no such showing of that nature at all, Your Honor, in any of these cases. Even if so, it's a spot market, but that's not what we're dealing with. Well, I believe Judge Ferguson is referring to the $40-plus billion in forward contracts that the CDWR, the California Department of Water Resources, entered into, again, in my view, of their own free will, fully informed. They had a very magnificent team. Well, given the circumstances, but what was there? Excuse me. Some of those have been renegotiated, I would say. For example, in the case of El Paso Merchant, they have been. They have been renegotiated. Yeah. Yeah, a lot of them have been renegotiated. I don't think that from the fact that they've been renegotiated, you can infer anything as to whether they should be reformed under Section 206. What I'm hearing is, you know, 25 years ago there was this crazy mortgage market, right, where the mortgages were like 20%, right? Well, people who negotiated in that market were negotiating of their own free will, but they were negotiating in a market which was a very unusual market, and I don't know if that was a dysfunctional, manipulated, or a lot market. So people here were negotiating of their own free will, given the circumstances and the market that they found. But if we don't answer the question that FERC refused to answer, or explain why we're not answering the question that FERC refused to answer, how can we say that the statutory requirement of just and reasonable rates was being met? Because you're looking at whether there's a public impact, and there's been no showing that there's been a material adverse public impact. The fact that prices went up, without ever showing that there was any dysfunctional component to that price rise, does not entitle the buyers to relief. In fact, these forward contracts were part of the cure that FERC prescribed for California's marketplace, and to grant relief here would have- FERC could have said that, but it's not what they said. They said, we don't care, it doesn't matter. Your Honor, I don't read the opinion, the decision quite the same. When the commission, in December 15, 2000, told people to move into the forward market, it recognized that prices were going to go up. That's a natural function of the marketplace, and it's important because you wanted these suppliers to come into the forward marketplace because by moving load into the forward marketplace, by meeting it with supplies available there, you disempower the rule dysfunction going on in the spot market. You disempower the people who may have been cheating in the spot market, and you thereby stabilize the marketplace. That's a very hard part of this case, because obviously moving into the forward market had a lot to do with the thing in the long run. And it's important, and this was important to the commission, is that we were buying and selling in the same marketplace. As was pointed out, there's been no showing that we manipulated any of these buyers into these contracts. In fact, the Nevada Attorney General admits that the Nevada companies freely entered into these contracts. But you still could have made an abnormally high profit because it was way more than your cost because of the nature of the spot market. You may have been completely innocent, but you still may have ended up getting a much larger profit than you would be entitled to in a non-dysfunctional market in which there was a zone of whatever the case language is. The price has approached a zone of reasonable risk. Your Honor, that is exactly, with respect, that is exactly the wrong mindset for looking at this case. Because if somebody was cheating in the spot market, and if it was having an effect in the marketplace, that you and I contract, even if my price is higher than it would be but for their cheating, the fact that you and I are contracting is what's supposed to be happening. The fact that you and I contract helps solve this problem over here. A 500 percent profit, quite legitimately, because that's how the market's running at the time. The commission can't care about that. An illustration, Your Honor, is OPEC, the oil cartel. Answer the judge's question, will you? I'm trying to do so directly, Your Honor. I mean, I took a year of economics here.  But I've been guided by several esteemed academics in this case. Our profit margin by itself in isolation on any one contract is immaterial when the contract is executed under a market rate regime. And the reason why is because that profit margin will fluctuate wildly in any given series of time as a market-based energy merchant. An example of what I mean about just reforming these contracts because you think we made too much money, even though we were otherwise innocent and why that's wrong, is shown by OPEC. We have a cartel outside the jurisdiction of the United States that fixes prices. And because of that, people in California, people in Texas, wherever, that sell oil, maybe they get more for their oil than they should. But we don't punish them. We don't take from them what we would perceive to be that unfair inflation. And the reason that we don't... They're not regulated by FERPA as a just and reasonable rate. Your Honor, I don't think the statutory scheme of the federal power changes my analogy here. The reason why we don't sanction that West Texas oil producer, the California oil producer, is because that entity helps us discipline the cheaters. It helps us discipline the market. It helps cure the problems associated with an over-dependence on spot market. And in here, if you say, well, on a post-hoc basis, these contracts are not enforceable, well, the next time you have a crisis, people are going to be reluctant to contract on a forward basis. And that's exactly the wrong thing at a time when you need supplies and loads. So you're really saying, and this was sort of my intuition too about what's going on here, is that FERC, because it needed this movement into the forward markets to clear up the spot market, essentially decided to look the other way with regard to worrying about whether the... Because it felt there was an imperative as to whether or not the statutory niceties were being met here. And it might make good sense, but I don't know if it... I disagree, Your Honor, that the Commission affirmatively or even inadvertently looked the other way as it concerns anything that was wrong. You need to bear in mind that these cases are narrowly focused on a particular cause of action. And to the extent that there are wrongdoers out there, people who have violated the court orders, they're being punished. They're being identified and they're being punished. This case doesn't absolve them of that. The Commission did expect prices to rise, and price rises in response to supply and demand conditions are not wrong. That's what a workably competitive marketplace does. I mean, if they're looking at what's fair and reasonable prices, then you don't think they ought to look into profit margins and the spot market effect it had. I mean, look to see what a fair and reasonable return is. Well, Your Honor, I think... What's wrong with that? It's an apples-to-oranges comparison to take a cost-of-service rate standard and just superimpose it on one particular transaction done pursuant to a market-based rate. In any given instance, you may find that the profit earned on that market-based rate exceeds or vastly under-collects profits that would be allowed in a cost-of-rate regime. So it's an apples-to-oranges comparison. And what you look at in a market-based regime is were there choices? Did the buyer have alternatives that were reasonably available? And if so, if those choices exist, then the competitive forces will discipline prices that in the long run match marginal costs of production. And here, there were choices. Are you saying that there was an ideal competitive structure here in this market? As it concerns... The way Adam Smith would define it? I don't know that I can speak for Mr. Smith, but I believe that the bilateral energy market... I believe that he would approve of the bilateral energy market because these are sophisticated market participants. They have been doing this for years. It's some small irony that the Sierra case we've all been talking about is actually the sister to Nevada Power. I think they're too sophisticated. Well, if the supplier didn't do anything wrong, if the price resulted from a workably competitive marketplace and the buyer misjudged which direction prices were going, well, that's the buyer's responsibility. But what about a dysfunctional marketplace? If there can be shown to be dysfunction, then perhaps the commission should act as it has in the California PX and ISO markets. And there we had a rule structure that was wholly different than bilateral negotiations where there's a back and forth. In the California market, the ISO and PX markets, it's a single clearing price auction. That is the last supplier who's needed to fill the demand for that increment of time, his price sets the price for all the suppliers in that time unit. That's completely different in a bilateral situation where I can negotiate with Judge Browning, Judge Ferguson, Judge Berzon, and I can pit you guys against each other either on an open basis or a blind basis. We won't do that. Well, it's interesting. Thank you, Your Honor. Thank you. Thank you. How much time do I have left? Eight minutes and 56 seconds. Judge, I'd like to give each of my colleagues one minute at the end. I'd like to save one minute for each of them to speak about their case. I will do that. I'd like to save it for you. You know, if I have to look here and you're getting close, and they're all squirming down there, it's distracting. I have just a couple of points. On behalf of Southern California Water Company, don't walk away from here thinking that the rate payers there are not paying higher rates because of this. The undisputed fact in the record is that the rates went up 38% on average as a result of this contract. Where is this? In the record. Yes. And how does that dovetail with the parts of the record? Yeah, you cited page 236 of the excerpts of the record, paragraph 99. Those statements are wrong by FERC, and we pointed this out in our brief, and I refer you particularly to my reply brief on page 27. FERC, in their orders here, just cherry picks two different classes. I mean, there are a lot of different rate payer classes in a utility. They've taken two of them out of here and said, well, certain ones aren't getting a rate increase, and this other second class, that doesn't look like a very high number to me. That's what they found. That's ridiculous. The overall rate increase is 38%. That's undisputed. Some people are paying more than 38%. Where is that in the record? Where is that in the record? It's in the testimony of Joel Dixon. He's the vice president of Southern California Water Company. And it's undisputed by FERC in the rehearing order. Look at paragraph 38. I'm sorry. Yeah, 38 of the rehearing order, page 406. I'm sorry. 37 and 38, where they accept the fact that there's a 38% rate increase, just say that's not enough. The bottom line for the public interest test is not the percentage increase as compared to prior rates. So they accept the fact that there's a 38% increase and say that's not enough under the undefined excessive burden test. Let me talk about the weighted average cost. In the rest of that paragraph, the weighted average cost of energy is $77 an hour. What time period is that? That's a three-year average. It was used to compute the rates and the retail rate settlement. But a lot of the contracts were shorter. No. There's only one contract for my five-year contract for $95. They had one other small contract that brought down the overall average to $87, and they settled on $77 in the retail rates. My second point is that when this contract was signed, the sellers had no legitimate expectation that these rates would be fixed. Because FERC in December 2000 had declared that we're going to monitor the long-term contracts negotiated in California in the next year. We're going to adopt the benchmark price. You all know what the benchmark price is. It's $74 for a five-year contract. And we'll use that benchmark price in a complaint if someone comes in and alleges that the contract price is too high. So, I have no ____ out the window. I have no legitimate expectation. You went into an agreement for more than $74. $95, yes. And so, what you're saying is that you negotiated an agreement for $95, knowing that it was $20 above the benchmark and thinking, well, that's okay because they're going to come in and save me later. No. Well, in essence, FERC had said, well, at that point, we didn't know whether that was going to be ____. FERC had not yet completed their investigations of the spot market. We didn't know what would happen. As soon as they did, they reduced the spot market prices dramatically, and the forward market prices fell dramatically. And it became evident later in 2000 that that $95 price was grossly inflated over what a true competitive market would have been in March 2001. We didn't know that at the time. You knew that if he asked that. No, we didn't know that at the time. FERC had adopted the benchmark. Oh, I'm saying the benchmark put everybody on notice. If Merit wanted to protect themselves from FERC regulatory intervention, they should have put contract language in there doing it. They failed to do so, and therefore, they have no reason to complain that FERC would now come in later. What language is that they should have put in? If they wanted to, they could have put in express mobile Sierra language like they did in their contract with the state of California. That would have solved the problem? Well, under their theory, it would. I don't think as a matter of law it should make a difference. But under FERC's theory, it would. But they didn't do it. They said in their testimony by their witnesses, we didn't consider it. We disregarded the risk that the Southern California Water Company would file a complaint. We're getting a little fire here. Hopefully I can keep this fairly short. I wanted to point out just a couple of things about the specifics that were faced by Snohomish. First of all, when we did an analysis of the numbers in the staff report, our expert witness twice submitted affidavits on the record indicating that, in fact, the spot market crisis in California caused the collapse of the forward markets in the Pacific Northwest, meaning we switched no choice and allowing the few suppliers that did exist to wield enormous market power. They had, under the standard market power measure, they had market power that was off the scales. Not only were we denied the opportunity to have FERC submit that record in rebuttal to their conclusions about the staff report, FERC didn't consider it in the orders it issued here. So you're saying that the representation that was made earlier that there's no allocation here of market power in the forward markets is wrong? That's wrong, yes. There were allocations, but you weren't able to prove it, you're saying? We weren't able to. FERC didn't consider the evidence, and they didn't provide us the opportunity to rebut their improper conclusions about what was contained in the PAO2 record and in the final staff report, and that's part of our allegations about the due process problems in this case. The second point is that there is record evidence about the overall impact of the crisis on Washington State. For example, in the 100 days evidence, which they did consider, there's a study that was reported in the Wall Street Journal where, in Washington State alone, there were 43,000 jobs lost, $1.7 billion in lost income. So the crisis was not confined to California, and you shouldn't come away with that impression. Is that responsive to the forward markets as opposed to the forward markets? That's responsive to the overall markets. Do you agree that there shouldn't be that? I mean, FERC seems to look at these as two different markets. Do you have a problem with that? Yes, I believe our evidence establishes that there's a direct connection between the forward markets and the forward markets. That's a different question, but are they distinct markets? I'm sorry? It's a different question about whether one's influencing the other, but you're not asking FERC to look at the dysfunction and the manipulation in the spot market and say, oh, this is just one market and, therefore, we win. That's not your argument. No. I mean, I think there are two arguments. First of all, that the dysfunction in the spot market affected all markets all across the West, including the forward markets, including the spot markets that we were faced with in the Pacific Northwest. The second one is, who cares what happened in the spot market? The evidence is that the forward market, even if you consider that in isolation, was dysfunctional in our case. It left us with no choice of suppliers. Again, I point out we had only three suppliers that were willing to supply us with 25 megawatts each, and we needed 75 megawatts, and we're a load-serving utility with a legal obligation to serve our customers. We can't just say no. We have to buy this power to supply the anticipated needs of our customers. I guess the last point is that, in terms of Berglund's question about third-party intervention, there was also third-party intervention in our case. We had three different customers come in, including Senator Cantwell, who's actually a residential customer of ours, and two industrial customers that intervened and asked for relief from these high rates and were essentially ignored by FERC in this case. Now I will ask Mr. Ryan to finish up. You're left in five seconds. Did I take less than five minutes? Let me see. Well, let's see. What was the surplus? Eight minutes. They went eight minutes over? The other side. Huh? They went five minutes over. All right. You want to sell them some of your time? Go ahead. Thank you, Your Honor. Let me just say that the impact on Nevada consumers is specifically in paragraph 98 of the FERC order, and this is the outrageous part of the FERC order. It says that if we have to pay Enron, if Nevada companies have to pay Enron, it will result in a 5% increase to the rate payers in Nevada. That's what the paragraph says. And it says that's not an excessive burden. In other words, they wish away the transfer of millions of dollars to Enron and say, here, that's not an excessive burden. I, too, had a learned professor that taught me something. It was Robert Samuelson. And in his economics class, he used to say, the law detains both women and men who steal the goose from off the common, but let the greater felon loose who steals the common from the goose. In this case, if we look at what's occurred, the transfer, if you uphold this order, my client will be ordered to transfer money to Enron that either we will be asked to eat as the utility or that the rate payers of Nevada will be asked to pay. That is not just and reasonable, nor were these just and reasonable prices. But it theoretically would make a difference under the statute or under the public interest approach under the statute, whether you eat it or whether you pass it on, or whether you can eat it. Could you be ordered to eat it? Yes. But we can't be ordered to eat it by FERC. I can be ordered to eat it by the PUCN, who is the third party in this case. How is it possible for FERC to even answer the public interest standard if the public interest standard means what the impact on the rate payer is going to be if the answer to that question is up to FERC to begin with? What FERC said here, Your Honor, is that that 5% rate increase across the board that would be a transfer based solely on payments to Enron. It might not be one because you might have to eat it. That's sort of what happened in California, as I understand it. There was a freeze on the rate. That is a possibility. But let's go back to whether these contracts were specifically affected, which is one of the issues we've talked about. In truth, we ended up with half of the value of our contracts with Enron, with the particular company that has been demonstrated in this record to be criminally manipulated. What kind of a market is it where half of the value of your contracts are with the party about which there can't be any so-called Western energy crisis? There is a true crisis and a manipulated market in that way. Let me go to one or two other points. At paragraph 19, the FERC made no finding that the long-term market was functioning properly here. Just as what FERC did in paragraph 94 was ducking the issue, I am willing to bet our entire case that the FERC in no way approved and said that these markets were working properly. And they couldn't in the Nevada Company's cases because our contracts were short-term contracts. In the very time period, yes, they're forward contracts, but just beyond the spot market. It belies logic to try and insert a credit card between the forward contracts that are in the immediate short-term period in 2001 and to say that they're going to be treated any differently. Which paragraph are you talking about? My brother, representing Enron and the other interveners, indicated that paragraph 19 was his best... Paragraph 19 in the rehearing? In the rehearing was his best authority for the notion that paragraph 94's deliberate non-finding is somehow met. And I do not... I think if you read the two together, you find that paragraph 94 requires this court, frankly, to reverse and remand with instructions to look at the record under a just and reasonable standard. Let me just say that when the court was asking me questions earlier about what Lockyer meant, I was struggling to find a particular phrase in the case that I think I would like to conclude with today. At 383 F. 3rd of 1017, the Lockyer court specifically rejected the notion that FERC's initial market-based rate authorization alone is adequate to ensure just and reasonable rates since that determination, quote, here's what the Lockyer court said, this court said, quote, may bear little or no relation to the realities of subsequent circumstances. In this case, that's exactly what occurred. Those grants of market-based authority, rate authority, bear no relationship to what happened in this marketplace. I thank the court for... I have one last thing. Yes, ma'am. It was said by your opponent, or one of your opponents, that there is no challenge, market power challenge in this case with regard to the foreign markets. Is that correct? Absolutely untrue. Can you tell me why? I'd like to actually, if I may, compose an answer to that. I'm a little bit rattled at this moment. If I can answer that in a single page in writing, I think I'll give a more coherent answer than I could now. But let me begin the answer. If the court would indulge me, I'd prefer to answer that for the record. I completely disagree, however, with that assertion. Thank you, Your Honor. All right. So when are you going to get that in? This week. Tomorrow. All right. We'll give the other side time to respond.  that you learned from your professors, just to write them down, because I collect those. And, you know, I'm serious. I've got a whole board, and I look at them every morning. I've got about 300 of them. That's why I'm late every day. All right. Will you do that? I'd like to thank all of you for your help. That was a good argument. We thank you. And we're going to take a short break.
judges: Browning, Pregerson, Berzon